# Exhibit A

MAXIMUS INC
Form 10-K filed on Nov 17, 2009 16:26:40

Exhibits

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended September 30, 2009
Commission file number: 1-12997

# MAXIMUS, INC.
(Exact name of registrant as specified in its charter)

| VIRGINIA | 54-1000588 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 11419 Sunset Hills Road, Reston, Virginia | 20190 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (703) 251-8500

Bloomberg Law® © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 1
Document Link: http://www.bloomberglaw.com/ms/document/X5UH2A9M4L0001

MAXIMUS INC, Form 10-K, File Number 001-12997, Filed Nov 17, 2009. Period date: Sep 30, 2009. Corporate Filing (11/17/2009)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, no par value | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ý   No o

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o   No ý

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ý   No o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer o     Accelerated filer ý     Non-accelerated filer o     Smaller reporting company o
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes o   No ý

The aggregate market value of outstanding voting stock held by non-affiliates of the registrant as of March 31, 2009 was $687,368,720 based on the last reported sale price of the registrant's Common Stock on The New York Stock Exchange as of the close of business on that day.

There were 17,653,436 shares of the registrant's Common Stock outstanding as of October 30, 2009.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement for its 2010 Annual Meeting of Shareholders to be held on March 18, 2010, which definitive Proxy Statement will be filed with the Securities and Exchange Commission not later than 120 days after the end of the registrant's fiscal year, are incorporated by reference into Part III of this Form 10-K.

MAXIMUS INC, Form 10-K, File Number 001-12997, Filed Nov 17, 2009. Period date: Sep 30, 2009. Corporate Filing (11/17/2009)

Table of Contents

# PART I

ITEM 1.   *Business.*

General

We provide operations program management and consulting services focused in the areas of health and human services primarily for government-sponsored programs such as Medicaid and the Children's Health Insurance Program (CHIP). Founded in 1975, we are one of the largest pure-play health and human services provider to government in the United States and are at the forefront of innovation in meeting our mission of *Helping Government Serve the People®*. We use our expertise, experience, and advanced technological solutions to help government agencies run more efficient and cost-effective programs, while improving the quality of services provided to program beneficiaries. We operate in the United States, Australia, Canada, the United Kingdom, and Israel. We have held contracts with government agencies in all 50 states in the U.S.

Over the last five years, our core health and human services business has continued to expand. This growth was offset by isolated program challenges, which have since been largely resolved. Fiscal 2007 results were impacted by a $25.2 million loss on the Texas Integrated Eligibility project where MAXIMUS served as a subcontractor to Accenture to provide services to the Texas Health and Human Services Commissions (TX HHSC). In February 2007, we terminated our subcontract with Accenture. In March 2007, TX HHSC terminated its contract with Accenture and contracted directly with us to provide support services for its CHIP and Medicaid programs. We continue to provide services under these programs, but on a profitable basis. In 2008, TX HHSC, Accenture and MAXIMUS settled all claims relating to those programs. In connection with that settlement, MAXIMUS paid a total of $40.0 million and agreed to provide services, valued at an additional $10.0 million, to TX HHSC over the next five years.

Our core health and human services business has benefited from steady demand over the last five years. In fiscal 2008 and fiscal 2009, many states experienced budgetary challenges; however, we have not experienced any material change in demand. Legislation such as the Deficit Reduction Act of 2005, Medicare Improvements for Patients and Providers Act (MIPPA), the American Recovery and Reinvestment Act (ARRA), the Reauthorization of the Children's Health Insurance Program (CHIP) in 2009, The Flexible New Deal in the United Kingdom, and the recent expansion of the Australian Human Service program has kept demand levels high. We believe that demand for our services is reasonably insulated since we provide domestic state and federal clients with administrative services for critical programs including Medicaid, Medicare, and CHIP, and, abroad, we administer several international government-sponsored health and human services programs. We believe we remain well positioned to benefit from pending initiatives related to health care reform, as well as increasing demand from domestic and international government clients who are dealing with increasing caseloads in government-run health and human service programs. Nevertheless, protracted fiscal pressures could adversely impact our business.

In fiscal 2009, MAXIMUS committed to the divesture of the non-strategic ERP business unit. This is in addition to five business units divested in fiscal 2008. These divestitures are designed to enable the Company to better focus on our core health and human services business portfolio where we are the leading pure-play provider in the administration of government health and human services programs.

Bloomberg Law®   © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 5
Document Link: http://www.bloomberglaw.com/ms/document/X5UH2A9M4L0001

MAXIMUS INC, Form 10-K, File Number 001-12997, Filed Nov 17, 2009. Period date: Sep 30, 2009. Corporate Filing (11/17/2009)

For the fiscal year ended September 30, 2009, we had revenue from continuing operations of $717.3 million and net income of $46.5 million.

Market Overview

Our primary customers are government agencies. In fiscal 2009, approximately 66% of our total revenue was derived from state government agencies whose programs received significant federal

3

Bloomberg Law®   © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 6
Document Link: http://www.bloomberglaw.com/ms/document/X5UH2A9M4L0001

MAXIMUS INC, Form 10-K, File Number 001-12997, Filed Nov 17, 2009. Period date: Sep 30, 2009. Corporate Filing (11/17/2009)

Table of Contents

risks and uncertainties that could affect our future financial condition and performance. The information in Exhibit 99.1 is incorporated by reference into this Item 1A.

ITEM 2.  *Properties.*

We own a 60,000 square foot office building in Reston, Virginia. We also lease offices for management and administrative functions in connection with the performance of our services. At September 30, 2009, we leased 79 offices in the United States totaling approximately 1,158,000 square feet. In four countries outside the United States, we leased 103 offices containing approximately 368,000 square feet. The lease terms vary from month-to-month to six-year leases and are generally at market rates.

We believe that our properties are maintained in good operating condition and are suitable and adequate for our purposes.

ITEM 3.  *Legal Proceedings.*

The Company is involved in various legal proceedings, including contract and employment claims, in the ordinary course of its business. The matters reported on below involve significant pending or potential claims against us.

(a) In December 2008, MAXIMUS, Accenture LLP and the Texas Health and Human Services Commission ("HHSC") entered into an agreement settling all claims among the parties arising from a prime contract between Accenture and HHSC for integrated eligibility services and a subcontract between MAXIMUS and Accenture in support of the prime contract. In connection with that settlement, MAXIMUS paid a total of $40.0 million and agreed to provide services to HHSC valued at an additional $10.0 million. The Company's primary insurance carrier paid $12.5 million of the amount due from MAXIMUS. In May 2009, the Company recovered an additional $6.3 million from one of its excess insurance carriers. The Company continues to pursue additional insurance recoveries from its other excess insurance carriers; however, such recoveries are not assured.

(b) In November 2007, MAXIMUS was sued by the State of Connecticut in the Superior Court in the Judicial District of Hartford. MAXIMUS had entered into a contract in 2003 with the Connecticut Department of Information Technology to update the State's criminal justice information system. The State claims that MAXIMUS breached its contract and also alleges negligence and breach of the implied warranty of fitness for a particular purpose. MAXIMUS has sued its primary subcontractor on the effort (ATS Corporation) which abandoned the project before completing its obligations. Although the State did not specify damages in its complaint, it demanded payment of alleged damages of approximately $6.2 million in a letter sent to the Company in September 2007. The Company denies that it breached its contract with the State. The Company cannot predict the outcome of the legal proceedings or any settlement negotiations or the impact they may have on the Company's operating results or financial condition.

(c) In March 2009, a state Medicaid agency asserted a claim against MAXIMUS in the amount of $2.3 million in connection with a contract MAXIMUS had through February 1, 2009 to provide Medicaid administrative claiming services to school districts in the state. MAXIMUS entered into separate agreements with the school districts under which MAXIMUS helped the districts prepare and submit claims to the state

Bloomberg Law® © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 25
Document Link: http://www.bloomberglaw.com/ms/document/X5UH2A9M4L0001

MAXIMUS INC, Form 10-K, File Number 001-12997, Filed Nov 17, 2009. Period date: Sep 30, 2009. Corporate Filing (11/17/2009)

Medicaid agency which, in turn, submitted claims for reimbursement to the Federal government. No legal action has been initiated. The state has asserted that its agreement with MAXIMUS requires the Company to reimburse the state for the amounts owed to the Federal government. However, the Company's agreements with the school districts require them to reimburse MAXIMUS for such payments and therefore MAXIMUS believes the school districts are responsible for any amounts disallowed by the state Medicaid agency or the Federal government. Accordingly, the Company believes its exposure in this matter is limited to its fees associated with this work and that the

13

Bloomberg Law®   © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 26
Document Link: http://www.bloomberglaw.com/ms/document/X5UH2A9M4L0001

# MAXIMUS INC (MMS)

## SSR-ISSRES
Filed on 05/19/2010

THOMSON REUTERS ACCELUS™



THOMSON REUTERS

MAXIMUS
11419 Sunset Hills Road
Reston VA 20190

United States Securities and Exchange Commission
Division of Corporate Finance -- Mail Stop 3010
Washington DC 20549

Dear Ms. Monick,

In response to your letter of April 5, 2010, our responses are below.

In addition, we acknowledge that:

    The Company is responsible for the adequacy and accuracy of the disclosure in the filing;

    Staff comments or changes to disclosure in response to staff comments do not foreclose the Securities and Exchange Commission from taking any action with respect to the filing;

    The Company may not assert staff comments as a defense in any proceeding initiated by the Securities and Exchange Commission or any person under the federal securities laws of the United States.

Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations:

We note your disclosure in this section and earlier in the business section on page 11 regarding your revenue backlog. Please tell us how the company's significant amount of backlog impacts its results of operations and liquidity. Please also include this disclosure in future filings.

At September 30, 2009, we estimated that we had approximately $1.8 billion of revenue in backlog. Backlog represents an estimate of the future revenue from existing signed contracts and revenue from contracts that have been awarded, but not yet signed. Our backlog estimate includes revenue expected under the current terms of executed contracts and revenue from contracts in which the scope and duration of the services required are not definite but estimable (such as performance-based contracts), but does not assume any contract renewals, extensions or option periods.

Increases in backlog result from the awarding of new contracts or extension or renewal of existing contracts and option periods. Reductions come from fulfilling contracts and early termination of contracts. Increases and decreases can follow from changes in estimates.

1
---

Our contracts typically include provisions permitting government customers the right to terminate the contract at short notice, with or without cause.

Of the balance at September 30, 2009, the Company anticipates recognizing 41% of this balance during fiscal 2010.

With the divestiture of the Systems businesses, the greater part of the Company's activities are now driven by the Company's Operations Segment. Contracts within this segment are typically longer than those of the Consulting Segment or the divested businesses as business process outsourcing agreements typically cover a number of years. At September 30, 2009, approximately 95% of the Company's backlog relates to the Operations Segment. This balance has increased to $1.7 billion from $1.2 billion at September 30, 2008, with the increase being principally due to significant new contracts in Australia and the United Kingdom. The Company expects approximately 41% of the backlog balance to be recognized in fiscal 2010 and expects backlog, in addition to anticipated option period renewals, to represent 93% of estimated 2010 revenues.

Revenue, operating income and cash flows have become more predictable as a result of the growth of the Operations Segment.

We shall update this information in future filings.

Note 9, Credit Facilities.

We note your disclosure of performance bond commitments. Please describe the general nature and key terms of these commitments.

Certain contracts require us to provide a surety bond as a guarantee of performance.

As of September 30, 2009, we had approximately $71.1 million of surety bonds outstanding.

These bonds are typically renewed annually and remain in place until the

contractual obligations have been satisfied.

Although the triggering events vary from contract to contract, in general, we would only be liable for the amount of these guarantees in the event of default in our performance of our obligations under each contract, the probability of which we believe is remote.

2
----

Note 13, Shareholders' Equity

We note you corrected an error related to stock-based compensation expense. Please tell us how you have complied with ASC 250.

In correcting an error to our 2006 and 2007 financial statements in 2008, management considered the effect of the adjustment on the financial results for 2006, 2007 and 2008, as well as the effect of the adjustment on the trend of earnings and other factors.

In performing this evaluation, management concluded that the identified error was not material to any of the periods affected.

That evaluation included consideration of the guidance related to materiality included in ASC 250-10-S99 (SAB Topic 1.M). In conjunction with that guidance, we considered both the quantitative and qualitative factors in concluding that the amounts are not material.

Quantatively, we considered the following:

The adjustments for each individual year and in total do not exceed 0.2% of revenues.

During the years in which the stock-based compensation adjustment occurred, management and industry analysts adjusted income for certain unusual and infrequently occurring items. Under the Texas HHSC contract, MAXIMUS served as the subcontractor to Accenture. This contract generated large losses and a write-off of deferred contract costs. In addition, the Accenture subcontract was a major driver to the legal and settlement expense, along with two other non-recurring and unusual items. Management considers this adjusted net income to be a more appropriate basis for measuring materiality. The table below provides the adjusted net income for those years. The stock based compensation was not material relative to each of the years in question after adjusting for these unusual items.

Prior to 2006, the Company had not recorded a loss as a public company and had recorded net income in excess of $35 million in each of the five fiscal years prior to 2006. Based upon this total, the effect of correcting this error would not have materially affected the results of operations in those years. Similarly, the Company has returned to its previous levels of profitability in fiscal 2009 and beyond. The stock expense error as a percentage of historical results would also not be material.

3
----

Table of MAXIMUS selected data 2004-2009

| amounts in 000s - tax effected | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| Revenue | 603,774 | 647,538 | 700,894 | 738,646 | 745,133 | 717,299 |
| Net income (loss) | 38,774 | 36,069 | 2,460 | (8,255) | 6,677 | 46,540 |
| Losses recorded on Texas contract | -- | -- | 29,887 | 15,246 | -- | -- |
| Legal and settlement expenses (recovery) | -- | -- | 5,683 | 26,885 | 23,207 | (4,271) |
| Deferred contract cost write-off | -- | -- | 10,351 | -- | -- | -- |
| Goodwill impairment | -- | -- | -- | -- | 4,598 | -- |
| Gain on sale of building | -- | -- | -- | -- | (2,382) | -- |
| Net income adjusted for unusual items | 38,774 | 36,069 | 48,381 | 33,876 | 32,100 | 42,269 |

| | | | |
|---|---|---|---|
| Adjustment to stock based compensation | (638) | (679) | 1,317 |
| Adjustment as a percentage of revenue | | | |
| Adjustment as a percentage of net income adjusted for unusual items | 0.1% | 0.1% | 0.2% |
| | 1.3% | 2.0% | 4.1% |

As part of the qualitative analysis, we considered the following:

The misstatement does not significantly change, or mask, changes in earnings or other trends.

Analysts historically review results adjusted for certain items discussed above and the misstatements would not impact their assessments. Also, the amounts misstated are non-cash stock compensation.

The misstatement would not move the Company between income or loss in any periods affected.

The misstatement does not affect any compliance matters, including compliance with debt covenants.

The misstatements do not affect management compensation.

The misstatements do not represent any unlawful or fraudulent transactions.

Upon our conclusion that the amounts were not material, we considered the guidance of ASC 250-10-S99-3 related to immaterial adjustments. The example in SAB Topic 5.F. states that, if an accounting change does not have a material impact in the financial statements, the cumulative effect of the change should be included in the income statement for the period in which the change is made. In accordance with that guidance, the full amount of the change is reflected in the period in which it was made.

---
4
---

Finally, we note that the errors and their correction were appropriately disclosed in the footnotes to our financial statements allowing the user of the statements transparency into our operating results.

Note 14, Commitments and Contingencies

In connection with the Texas Health and Human Services Commission ("HHSC") settlement, you agreed to provide future services to HHSC valued at $10 million. Please tell us how you accounted for this portion of the settlement. Within your response, reference the authoritative accounting literature management relied upon.

During 2006 and 2007, the Company was a subcontractor to Accenture on a contract to provide certain integrated eligibility and related support services to the State of Texas Health and Human Services Commission (HHSC). During the term of the contract, certain performance issues arose and ultimately resulted in the termination of the contract between HHSC and Accenture. Subsequently, MAXIMUS filed arbitration claims against Accenture, and Accenture filed counter-claims against MAXIMUS related to the Company's performance on the subcontract.

On December 12, 2008, the Company entered into a three-way settlement agreement with Accenture and HHSC to settle the arbitration and claims among the three parties. The settlement agreement required MAXIMUS to pay a total of $40 million in cash to Accenture and HHSC and to provide $10 million in "Future Services" to be provided to HHSC.

The settlement agreement provided the following:

MAXIMUS shall pay HHSC with services or service credits in an amount not to exceed Ten Million Dollars ($10,000,000) at rates which are approved by HHSC and as agreed to by HHSC and MAXIMUS in writing to be signed within 180 calendar days of the Closing Date (the "Future Services"). If MAXIMUS and HHSC fail to reach written agreement regarding the Future Services, or if HHSC does not exhaust the service credits comprising Future Services by August 31, 2014, MAXIMUS will pay HHSC the remaining unused value of the Future Services in cash or credit HHSC an equivalent sum against any contracts with HHSC then in effect.

In conjunction with this settlement, the Company recorded a pre-tax charge of $37.5 million in legal and settlement expense relating to the HHSC settlement, representing the $40 million of cash payments and the fair value of the $10 million of future services, offset by the reimbursement of $12.5 million from our insurance carrier.

The portion of the settlement related to the Future Services was recognized at its fair value. The Company considered the guidance in ASC 845-10 Nonmonetary Transactions, in arriving at this conclusion. In particular, ASC 845-10

requires that "the accounting for nonmonetary transactions should be based on the fair values of the assets (or services) involved." While management considered the exceptions to the fair value requirements in ASC 845-10, we concluded that the $10 million

5

---

represented the fair value of the Future Services as the terms of the settlement agreement enforce this concept. By refusing to agree to the terms of the Future Services, either party could enforce payment of the $10 million in cash. HHSC would not accept services with a value less than $10 million as they could enforce payment in cash. Further, MAXIMUS would not agree to provide services with a value in excess of $10 million, as the Company has no obligation to do so and could, if required, settle the balance in cash.

The balance was recorded as a short-term liability. MAXIMUS notes that monthly billings to the State of Texas exceed the $10 million balance and, accordingly, the balance could be utilized immediately if the state chose to apply it against their current obligations. The corresponding expense related to the $10 million of services was recorded in legal and settlement expense, as were the cash payments made relating to the settlement.

Proxy Statement of Form 14A

We note your references to pre-codification GAAP in the footnotes. In future filings, please reference the new Accounting Standards Codification.

We acknowledge this omission and will reflect this in future filings.


Sincerely



/s/ David N. Walker


David N. Walker

Chief Financial Officer

6

---

MAXIMUS INC
Form 10-K filed on Nov 19, 2010 17:27:02

Exhibits

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended September 30, 2010

Commission file number: 1-12997

# MAXIMUS, INC.
(Exact name of registrant as specified in its charter)

| VIRGINIA | 54-1000588 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 11419 Sunset Hills Road, Reston, Virginia | 20190 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(703) 251-8500**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, no par value | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes x No o

Bloomberg Law® © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 1
Document Link: http://www.bloomberglaw.com/ms/document/X68TUPAGON8001

MAXIMUS INC, Form 10-K, File Number 001-12997, Filed Nov 19, 2010. Period date: Sep 30, 2010. Corporate Filing

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o No x

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes x No o

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes £ No £

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer x                    Accelerated filer o

Non-accelerated filer o                      Smaller reporting company o
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes o No x

The aggregate market value of outstanding voting stock held by non-affiliates of the registrant as of March 31, 2010 was $925,056,016 based on the last reported sale price of the registrant's Common Stock on The New York Stock Exchange as of the close of business on that day.

There were 17,210,381 shares of the registrant's Common Stock outstanding as of November 1, 2010.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement for its 2011 Annual Meeting of Shareholders to be held on March 18, 2011, which definitive Proxy Statement will be filed with the Securities and Exchange Commission not later than 120 days after the end of the registrant's fiscal year, are incorporated by reference into Part III of this Form 10-K.

Bloomberg Law®   © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 2
Document Link: http://www.bloomberglaw.com/ms/document/X68TUPAGON8001

MAXIMUS INC, Form 10-K, File Number 001-12997, Filed Nov 19, 2010. Period date: Sep 30, 2010. Corporate Filing

Table of Contents

The principal driver of growth for the 2009 fiscal year was strong results in our Health Services Segment. The Human Services Segment was adversely affected by the strong United States Dollar, which was partially offset by the benefit of a full year of operations from the Company's UK subsidiary, which was acquired in the fourth quarter of fiscal 2008.

Selling, general and administrative expense (SG&A) consists of costs related to general management, marketing and administration. These costs include salaries, benefits, bid and proposal efforts, travel, recruiting, continuing education, employee training, non-chargeable labor costs, facilities costs, printing, reproduction, communications, equipment depreciation, intangible amortization, and legal expenses incurred in the ordinary course of business. In fiscal 2008, SG&A includes an additional charge of $2.2 million related to the under-estimation of stock option charges in 2006 and 2007. Without this adjustment, SG&A expenses in that year as a percentage of revenue would have been 15.5%. In 2010, SG&A included a bad debt charge of $2.2 million related to a long-term receivable balance. Without this charge, SG&A as a percentage of revenue would have been 14.0%. SG&A as a percentage of revenue has declined year-on-year for each of the last two years. This is the result of improved efficiencies within the business.

Operating income from continuing operations increased 21.2% in fiscal 2010 compared to fiscal 2009, from $88.6 million to $107.4 million. The increase of $18.8 million has been driven by growth in the business, the benefits of favorable exchange rates on foreign-sourced income, and increasing economies of scale in operating the business.

Operating income from continuing operations increased 92% in fiscal 2009, compared to fiscal 2008, from $46.0 million to $88.6 million. The increase of $42.6 million is primarily attributable to a $4.3 million legal and settlement recovery in 2009 compared with a charge of $38.4 million in 2008. See the discussion of Legal and Settlement expense below for a breakdown of this balance. In addition, fiscal 2008 benefited from a non-recurring $3.9 million gain on the sale of a property in McLean, Virginia.

Legal and settlement expense (recovery), net for fiscal years 2008, 2009 and 2010 was $38.4 million, ($4.3 million), and ($5.4 million), respectively. Legal and settlement expense (recovery) consists of costs, net of reimbursed insurance claims, related to significant legal settlements and non-routine legal matters, including future probable legal costs estimated to be incurred in connection with those matters. Legal expenses incurred in the ordinary course of business are included in selling, general and administrative expense.

Following a change in accounting standards, from October 1, 2009 the incremental costs of acquisitions, including legal fees, brokerage fees, and valuation reports, are included in this balance. Under previous accounting guidance, these expenses were included as part of the acquisition consideration of successful acquisitions. The following table sets forth the matters that represent legal and settlement expense (recovery), net:

|  | Year ended September 30, | | |
| --- | --- | --- | --- |
|  | 2008 | 2009 | 2010 |
|  | (Dollars in thousands) | | |
| Acquisition expenses | $ | $ | $ 254 |

Bloomberg Law®   © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 35
Document Link: http://www.bloomberglaw.com/ms/document/X68TUPAGON8001

MAXIMUS INC, Form 10-K, File Number 001-12997, Filed Nov 19, 2010. Period date: Sep 30, 2010. Corporate Filing

|  |  |  |  |
|---|---:|---:|---:|
| Accenture Arbitration, Related Settlement and Insurance Recoveries, net | 38,377 | (6,300) | (7,500) |
| Other | (19) | 2,029 | 1,895 |
| Total | $ 38,358 | $ (4,271) | $ 5,351 |

In December 2008, MAXIMUS, Accenture LLP and the Texas Health and Human Services Commission ("HHSC") entered into an agreement settling all claims among the parties arising from a prime contract between Accenture and HHSC for integrated eligibility services and a subcontract between MAXIMUS and Accenture in support of the prime contract. In connection with that settlement, MAXIMUS paid a total of $40.0 million and agreed to provide services to HHSC valued at an additional $10.0 million. The Company's primary insurance carrier paid $12.5 million of the amount due from MAXIMUS at the time of the settlement. In fiscal 2009, the Company recovered an additional $6.3 million from one of its excess insurance carriers, and in fiscal 2010 the Company recovered $7.5 million from another excess insurance carrier.

The decrease in interest and other income between 2008 and 2010 is primarily attributable to declines in market rates. At the beginning of fiscal 2008, the Company held a balance of cash and cash equivalents and marketable securities of $196.7 million. During the first quarter, $150 million was used as part of a share buyback, significantly reducing the cash balance and the consequent interest income. At the current time, the Company holds cash and cash equivalents in excess of $150 million but is generating significantly lower returns on this balance due to the decline of market rates. Approximately half of the interest earned in 2010 relates to interest on the loan note related to the sale of Unison MAXIMUS Inc., discussed below under Discontinued Operations.

Bloomberg Law® © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 36
Document Link: http://www.bloomberglaw.com/ms/document/X68TUPAGON8001

MAXIMUS INC
Form 10-K filed on Nov 14, 2011 08:6:9

Exhibits

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended September 30, 2011

Commission file number: 1-12997

# MAXIMUS, INC.
(Exact name of registrant as specified in its charter)

| VIRGINIA | 54-1000588 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 11419 Sunset Hills Road, Reston, Virginia | 20190 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(703) 251-8500**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, no par value | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes x No o

**Bloomberg Law®**   © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 1
Document Link: http://www.bloomberglaw.com/ms/document/7239493947459043329

MAXIMUS INC, Form 10-K, File Number 001-12997, Filed Nov 14, 2011. Period date: Sept 30, 2011. Corporate Filing

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o No x

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes x No o

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes x No o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer x       Accelerated filer o

Non-accelerated filer o       Smaller reporting company o
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes o No x

The aggregate market value of outstanding voting stock held by non-affiliates of the registrant as of March 31, 2011 was $1,195,512,731 based on the last reported sale price of the registrant's Common Stock on The New York Stock Exchange as of the close of business on that day.

There were 33,585,754 shares of the registrant's Common Stock outstanding as of November 1, 2011.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement for its 2012 Annual Meeting of Shareholders to be held on March 7, 2012, which definitive Proxy Statement will be filed with the Securities and Exchange Commission not later than 120 days after the end of the registrant's fiscal year, are incorporated by reference into Part III of this Form 10-K.

Bloomberg Law®   © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 2
Document Link: http://www.bloomberglaw.com/ms/document/7239493947459043329

MAXIMUS INC, Form 10-K, File Number 001-12997, Filed Nov 14, 2011. Period date: Sept 30, 2011. Corporate Filing

Table of Contents

The following table provides a summary of our cash flow information for the years ended September 30, 2011, 2010, and 2009:

|  | Year ended September 30, | | |
| --- | --- | --- | --- |
|  | 2011 | 2010 | 2009 |
|  | (dollars in thousands) | | |
| Net cash provided by (used in): | | | |
| Operating activities—continuing operations | $ 97,585 | $ 140,971 | $ 32,534 |
| Operating activities discontinued operations | (725) | (2,530) | (1,901) |
| Investing activities—continuing operations | (26,898) | (32,395) | (26,946) |
| Investing activities discontinued operations |  |  | (90) |
| Financing activities—continuing operations | (50,587) | (42,402) | (35,574) |
| Effect of exchange rates on cash and cash equivalents | (1,746) | 3,862 | 187 |
| Net increase (decrease) in cash and cash equivalents | $ 17,629 | $ 67,506 | $ (31,790) |

Cash provided by operating activities from continuing operations was $97.6 million in fiscal 2011, a decline of $43.4 million compared to fiscal 2010. The principal driver for this decline was the cash flows associated with the United Kingdom's Flexible New Deal program, which provided significant up-front funds during fiscal 2010, resulting in a larger deferred revenue balance. In the United Kingdom, we received $22.7 million of cash in excess of revenues in fiscal 2010 and recognized revenues in excess of cash receipts of $9.0 million in fiscal 2011, a net change in deferred revenue of $31.7 million. The United Kingdom contract was the largest driver of changes in deferred revenue. Fiscal 2011 cash flows were also adversely affected by the timing of tax payments, with payments in excess of expense of $8.4 million, resulting in prepaid income taxes. These declines were offset by an increase in net income of $10.8 million.

Cash provided by operating activities from continuing operations was $141.0 million in fiscal 2010, an increase of $108.4 million compared to fiscal 2009. Principal drivers for this increase were an increase in net income of $23.9 million; favorable payment terms on certain contracts, principally the United Kingdom Flexible New Deal, resulting in significant deferred revenue of $25.5 million; timing on cash collections of receivables of $22.2 million; and a non-recurring payment of $40 million made in conjunction with the legal settlement with TX HHSC and Accenture in December 2008, offset by $18.8 million of insurance recoveries. The legal settlement was recorded as an expense in fiscal 2008 but not paid until fiscal 2009.

Cash provided by operating activities from discontinued operations relates to the Company's ERP division, which was disposed of at September 30, 2010. Payments made in fiscal 2011 principally relate to the settlement of payroll and other liabilities that remained with the Company at

Bloomberg Law®   © 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 40
Document Link: http://www.bloomberglaw.com/ms/document/7239493947459043329

MAXIMUS INC, Form 10-K, File Number 001-12997, Filed Nov 14, 2011. Period date: Sept 30, 2011. Corporate Filing

the date of disposal.

Cash used in investing activities was $26.9 million in fiscal 2011, compared with $32.4 million in fiscal 2010. The decline of $5.5 million is principally caused by a $11.0 million decline in payments to acquire businesses, notably DeltaWare. In fiscal 2010, the Company paid $12.0 million for DeltaWare and other businesses; in fiscal 2011, a single payment of $1.0 million was made to the previous owners of DeltaWare related to the achievement of an earn-out. The balance of the difference was caused by $3.5 million additional capital expenditure in the 2011 fiscal year principally in the United States and British Columbia, and a $1.7 million receipt from the sale of the ERP business in fiscal 2010.

Cash used in investing activities from continuing operations was $32.4 million in fiscal 2010, compared with $26.9 million in 2009. The increase of $5.5 million was principally driven by (1) $12 million of acquisition payments related to DeltaWare and other acquisitions in 2010, compared with $0.4 million in 2009, offset by (2) declines in overall capital spending of approximately $4.0 million following significant build out for contract expansions in Australia and the United Kingdom, as well as the completion of an Enterprise Resource Planning system for internal use in 2009, and (3) $1.7 million of cash received from the sale of the Company's ERP division in 2010, compared with cash payments of $1.6 million related to other disposals in 2009.

22

Bloomberg Law

© 2012 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 41
Document Link: http://www.bloomberglaw.com/ms/document/7239493947459043329